Cite as 2020 Ark. App. 221

# ARKANSAS COURT OF APPEALS
DIVISION I
**No.** CV-19-763

| | |
|---|---|
| FULTON COUNTY HOSPITAL AND RISK MANAGEMENT SERVICES | **Opinion Delivered:** April 8, 2020 |
| APPELLANTS | APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION [NO. G707822] |
| V. | |
| MELISSA J. HERRING | |
| | AFFIRMED |
| APPELLEE | |

**MEREDITH B. SWITZER, Judge**

Fulton County Hospital and its insurance carrier, Risk Management Resources (collectively "Hospital"), appeal the decision of the Arkansas Workers' Compensation Commission ("Commission") that Melissa Herring suffered a compensable left-knee injury on May 17, 2017, arguing that substantial evidence does not support the Commission's determination. We affirm the Commission's decision.

I. *Hearing Testimony*

Herring testified that she had worked as a licensed practical nurse for the Hospital for almost ten years. In her deposition, Herring explained that on May 17, 2017, she was working a twelve-hour day shift; she was busy performing her duties, including delivering meal trays, dispensing medications, attending to patients, and charting medical information; and she was subject to being interrupted during these tasks by call lights, phone calls, and questions from patients' families. She said that around 5:30 p.m., a patient called her for assistance to move to the bedside commode. When the patient collapsed during the transfer,

Herring held the patient in a pivoting position with her knees on the floor to prevent the patient from falling to the floor while she completed the transfer. Herring said that during the transfer, she felt a "pop" in the right side of her left knee. Although she felt a tightening on the inside of her knee, she did not report an injury and continued her shift for the next one and a half hours. She did not tell anyone about her injury; she began icing her knee that night for thirty minutes every two hours and kept it elevated, thinking that it would resolve itself.

Herring testified that when she hurt her knee, all of her supervisors were gone for the day. She said that she told Susan Neely, the assistant director of nursing who was also Herring's supervisor, about the incident five days after it occurred, but Neely told her it was "too late" to report the incident. Herring stated that within a week of the incident she also spoke with Melanie Stone, the charge nurse on duty the day she was injured, and Mandy Kauffman, a registered nurse at the hospital, and told them that she had hurt her knee at work. Stone told Herring to tell Neely. Herring told Stone she had already told Neely and was told that it was too late to do anything about it. Herring said a couple of weeks after her injury, a woman named Regina from the human-resources department gave her some workers'-compensation forms, which she completed and returned; Regina then sent the forms to MedCor and instructed Herring to call MedCor and report her injury. Herring said that when she spoke to MedCor, she reported the date and time the injury occurred and was asked if she had seen a doctor. She reported that she had seen Dr. Kauffman, and she was told that was okay.

Herring testified that she saw her primary-care physician, Dr. Kauffman, who referred her to Dr. Rauls. She saw Dr. Rauls on June 9, 2017, and Dr. Rauls performed a left-knee scope on June 16, 2017. Herring testified that Dr. Rauls's records indicated she injured her knee after feeling a pop at work. Herring changed physicians to Dr. Chris Arnold, who saw her on March 29, 2018. He performed a scope and surgery on April 11, 2018, and a total knee replacement on October 19, 2018. She denied having any knee issues prior to the May 17 incident.

On cross-examination, Herring admitted that in her deposition she stated she first sought medical treatment from the Hospital emergency room ("ER"), but her testimony at the hearing was that she saw Dr. Kauffman first at Salem Family Clinic on May 26, 2017, nine days after her injury, and he referred her to an orthopedic physician. Herring acknowledged that Dr. Kauffman's report did not indicate she told him that she was injured at work, and that his nurse practitioner diagnosed her with degenerative joint disease on that visit.

Herring agreed that when an incident occurred during a patient transfer it was considered a reportable incident; however, she did not report it. She also admitted she did not tell a supervisor or anyone else that she had hurt her knee on May 17 because she did not think anything would come of it. Although Herring injured herself after 5:30 p.m., there was always a charge nurse on duty after that time, and Herring admitted she should have reported her injury to the charge nurse but did not do so. Herring said she did not work on May 18 and did not recall when she worked next except it was after she had gone to the ER.

3

A May 27, 2017 Hospital ER report indicated that Herring presented with left-knee pain, had been seen by her primary-care physician the day before and was diagnosed with a Baker's cyst on her left knee, had fluid drained from the knee, and was given a steroid injection. The report further stated Herring informed the ER that she had stepped off the porch that day and felt a pop, which Herring denied. Herring claimed she told the nurse that she was injured at work transferring a patient.

Herring then testified that she could not recall if she had worked from May 18 to May 27, but she claimed she reported her injury to Regina Caldwell and Susan Neely via text message prior to going to the ER on May 27. Herring testified she was seen in Dr. Kauffman's clinic on May 31, 2017, by the nurse practitioner who recorded the following history for her left knee: Herring was walking, heard a pop in her knee, the knee began to hurt, had a "dull ache" all the time, there was "stabbing" pain when she walked, and there was swelling, causing Herring to use crutches. Herring testified that her knee began to swell the night she hurt it. The first mention of a work-related incident in Dr. Kauffman's records was not until December 12, 2017. That record indicated that she had developed pain and swelling at work on May 17, 2017, had her knee drained, and was referred to Dr. Rauls.

Thomas Cooper, the Hospital safety manager, testified that the Hospital asks employees to report a work-related injury to a direct supervisor within twenty-four hours or to the charge nurse if the employee's direct supervisor is unavailable. Cooper stated that according to Hospital records, Herring worked full shifts on May 17, 18, 23, and 24, 2017, and she worked five hours on May 31 because that was the day she was seen by Dr. Kauffman. Herring disputed she worked those days, stating that she might have been

4

scheduled to work those days but did not do so. Cooper also stated that the incident between Herring and the patient absolutely warranted a patient-incident report, but he admitted that while a majority of the incidents are reported, some are not.

An MRI was performed on June 5, 2017. It indicated a root tear of the posterior horn of the medial meniscus that was at least high-grade partial; adjacent edema within the soft tissues; moderate-sized joint effusion; sprain of the medial collateral ligament; and chondromalacia of the medial compartment. On June 6, Dr. Kauffman referred her to Dr. Rauls for the medial meniscus tear. Dr. Rauls performed a left-knee arthroscopic abrasion chondroplasty medial femoral condyle; his opinion was that the medial meniscus overall looked good, and the ACL was intact.

Herring was seen by Dr. Casey Wagner on March 29, 2018; x-rays were taken on her left knee, and a second MRI was ordered. On April 6, Herring returned to Dr. Wagner; the MRI indicated a medial meniscus tear including a tear of the posterior horn root, moderate to severe weightbearing medial femorotibial osteo chondrosis as well as irregular, moderate grade chondrosis along the medial patella, small to moderate knee effusion. Herring saw Dr. Arnold on April 10, who noted Herring had injured her knee at work ten months prior; she had undergone a left-knee scope, chondroplasty in June 2017 that offered no relief of pain; and despite conservative treatment, she continued to have pain and swelling in her knee. Dr. Arnold opined that Herring had left-knee pain secondary to a medial meniscus tear and early osteoarthritis, and the MRI showed a medial meniscus tear including a tear of the posterior horn root, moderate to severe weightbearing medial femorotibial osteochondrosis as well as irregular, moderate chondrosis along the medial patella, small to

5

moderate knee effusion.  Dr. Arnold performed the second scope on Herring's left knee on April 11,  and her total left-knee replacement on October 19.

## II.  *Commission's Decision*

The administrative law judge (ALJ) denied Herring benefits, finding she failed to satisfy her burden of proving that a work-related injury arising from her employment was the cause of her left-knee injury.  The Commission reversed the ALJ's denial of benefits, finding Herring proved by a preponderance of the evidence she sustained a compensable left-knee injury on May 17, 2017.  The Commission's decision, in pertinent part, states:

> A claimant is not required in every case to establish the causal connection between a work-related incident and an injury with an expert medical opinion.  *See Wal-Mart Stores v. VanWagner*, 337 Ark. 443, 990 S.W.2d 522 (1999).  The Arkansas courts have long recognized that a causal relationship may be established between an employment related incident and a subsequent physical injury based on evidence that the injury manifested itself within a reasonable period of time following the incident so that the injury is logically attributable to the incident, where there is no other reasonable explanation for the injury. *Hall v. Pittman Construction Co.*, 235 Ark. 104, 357 S.W.2d 263 (1962).

> The evidence preponderates that the claimant's left knee injury satisfies the requirements of compensability.  The claimant's injury was an accidental injury sustained while the claimant was performing employment services.  The claimant testified that she sustained an injury at work on May 17, 2017 when she was assisting a resident onto a bedside commode.  The claimant testified that her knew began swelling the same night of the incident.  The claimant sought medical treatment nine days after her workplace accident.  An MRI taken on June 5, 2017, revealed a root tear of the posterior horn of the medial meniscus in the claimant's left knee.  Given the closeness in proximity of the time between the work accident and the complaint of left knee swelling and pain, the Full Commission finds that the claimant's injury was caused by her workplace accident.

> Also, the injury was an internal or external physical injury that is supported by objective findings in the form of a left knee medial meniscus tear.  In addition, the claimant's left knee injury required medical treatment in the form of prescription medication, physical therapy, and surgical intervention.

Further, the injury arose out of and in the course of employment. The claimant testified that when she was helping a resident up from a chair, the resident collapsed on her. To keep the resident from falling, the claimant held her with her weight in a pivoting position. The claimant's knees stayed on the floor as she placed the resident on the bedside commode. During the incident the claimant felt a pop in the right side of her left knee. The claimant's testimony is supported by the history provided to her medical providers and documents in the medical records.

The respondents argued that the claimant failed to prove that her left knee injury arose out of her employment, noting an alleged delay in reporting the workplace incident. Regarding the delay in reporting her injury to the respondent-employer, the claimant explained that, although it was standard procedure for each floor of the facility to be staffed with two nurses at a time, on the day the claimant's accident occurred, she was the only nurse on the floor. The claimant testified further that when the needs of the residents are demanding, there isn't time to do anything other than care for the residents. Additionally, the claimant's accident happened after normal business hours, when there were no supervisors available to whom she could report the accident.

In addition, the claimant offered credible testimony that she reported her workplace accident to three of the respondent-employer's employees within one week of the incident, i.e., Susan Neely, Melanie Stone, and Mandy Kauffman. Instead of offering the claimant workers' compensation paperwork, which would have been the appropriate response, Neely informed the claimant that it was "too late" to address the work-related injury. The claimant testified credibly that she informed the respondent-employer of the workplace accident. Therefore, we find that the claimant gave notice to the employer within a reasonable time period pursuant to the requirements set forth in A.C.A. § 11-9-701.

The respondents further argue that the claimant's injury was not an acute injury, but instead was degenerative in nature. The claimant was in fact diagnosed with degenerative joint disease in her left knee; however, a pre-existing disease of infirmity does not disqualify a claim if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the disability for which compensation is sought. *See Nashville Livestock Commission v. Cox*, 302 Ark. 69, 787 S.W.2d 664 (1990); *Conway Convalescent Center v. Murphree*, 266 Ark. 985, 585 S.W.2d 462 (Ark. App. 1979); *St. Vincent Medical Center v. Brown*, 53 Ark. App. 30, 917 S.W.2d 550 (1996). The employer takes the employee as he finds him. *Murphree*, *supra*. The claimant worked for the respondent-employer as a nurse for ten years without restrictions or limitations. The claimant testified that she had not had any problems with her left knee prior to the May 17, 2017 workplace accident. The claimant's testimony is supported by the fact that there was no evidence in the record that she had previously sought or received any treatment for her left knee. Even though the claimant suffered from a previously asymptomatic degenerative

7

condition, she clearly suffered a meniscus tear that met the requirements for compensability.

Therefore, for the foregoing reasons, the Full Commission finds that the claimant proved by a preponderance of the evidence that she sustained a compensable left knee injury.

### III. *Standard of Review*

In appeals involving workers'-compensation claims, this court views the evidence in the light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. *Webb v. Wal-Mart Assoc., Inc.*, 2018 Ark. App. 627, 567 S.W.3d 86. Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. *Greene Cty. Judge v. Penny*, 2019 Ark. App. 552, 589 S.W.3d 478. The issue on review is not whether the appellate court might have reached a different result; we affirm if reasonable minds could reach the Commission's conclusion. *Ark. Highway & Transp. Dep't v. Wiggins*, 2016 Ark. App. 364, 499 S.W.3d 229.

To prove the occurrence of a specific-incident compensable injury, the claimant must establish that (1) an injury occurred arising out of and in the scope of employment; (2) the injury caused internal or external harm to the body that required medical services or resulted in disability or death; (3) the injury is established by medical evidence supported by objective findings; and (4) the injury was caused by a specific incident and is identifiable by time and place of occurrence. *Pafford Med. Billing Servs., Inc. v. Smith*, 2011 Ark. App. 180, 381 S.W.3d 921.

Questions concerning the credibility of witnesses and the weight to be accorded their testimony are within the exclusive province of the Commission, and this court defers to the Commission's conclusions. *Penny*, *supra*. If there are contradictions in the evidence, it is

8

within the province of the Commission to reconcile conflicting evidence and to determine the true facts. *Georgia-Pacific Corp. v. Carter*, 62 Ark. App. 162, 969 S.W.2d 677 (1998). The Commission has the authority to accept or reject medical opinions, and its resolution of the medical evidence has the force and effect of a jury verdict. *Lonoke Exceptional Sch., Inc. v. Coffman*, 2019 Ark. App. 80, 569 S.W.3d 378. However, the Commission may not arbitrarily disregard medical evidence. *Id.* In order for an administrative action to be invalid as arbitrary, it must either lack any rational basis or hinge on a finding of fact based on an erroneous view of the law; an act is not arbitrary simply because the appellate court would have decided differently. *Id.*

IV. *Discussion*

The Hospital asserts the evidence does not support the Commission's finding that Herring sustained a compensable injury, arguing that the Commission took Herring's testimony "at face value" and ignored the fact that she failed to report her injury, even though she could have reported her injury to the charge nurse on duty. The Hospital contends Herring's "excuse" for not reporting her injury was not credible and cast doubt on whether the injury had occurred, calling the existence of the injury "highly suspect" and arguing Herring's testimony was inconsistent, unsupported, self-serving, and uncorroborated. The Hospital claims the Commission arbitrarily disregarded the inconsistencies and contradictions in Herring's testimony unfavorable to her; that the medical records were not consistent with a work-related injury; and that because reasonable persons could not find otherwise, there was no substantial evidence to support an award of benefits to Herring.

9

Although the Hospital asserts the Commission should not have found Herring's version of events credible, such determinations are within the Commission's province, and this court is bound by those decisions. *Penny*, *supra*. Herring's failure to immediately report her injury does not preclude a finding that Herring suffered a work-related injury—it simply goes to the weight of the evidence. The Commission was aware of inconsistencies in the evidence but found Herring's testimony as to how she injured her left knee to be credible; this court will not reweigh those credibility determinations.

The Hospital also argues that the Commission's finding that Herring had met her burden of proving that she sustained a compensable injury given the close proximity of the time between Herring's alleged injury and the swelling and pain is not supported by substantial evidence. This appears to be an argument regarding whether Herring proved a causal relationship between her need for treatment and her injury. Objective medical evidence is necessary to establish the existence and extent of an injury, but not necessary to establish the causal relationship between the injury and a work-related accident. *Wal-Mart Stores v. Van Wagner*, 337 Ark. 443, 990 S.W.2d 522 (1999). If objective medical evidence establishes the existence of an injury, and a preponderance of the other nonmedical evidence establishes a causal relation to a work-related incident, that is sufficient proof to sustain a workers'-compensation claim. *Id*.

The Hospital does not argue there are no objective medical findings that Herring suffered an injury. The question of whether there was a causal connection again hinges on the Commission's credibility determinations, and it found Herring's testimony credible as

10

to how her injury occurred.   There is substantial evidence to support the Commission's award of benefits; therefore, we affirm.

Affirmed.

GLADWIN and MURPHY, JJ., agree.

*Barber Law Firm PLLC*, by: *Karen H. McKinney*, for appellant.

*Frederick S. "Rick" Spencer*, for appellee.